IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| ARTHUR GOBER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPRINT CORPORATION, RAUL MARCELO CLAURE, MICHEL COMBES, GORDON M. BETHUNE, PATRICK T. DOYLE, RONALD D. FISHER, JULIUS GENACHOWSKI, STEPHEN R. KAPPAS, ADMIRAL MICHAEL G. MULLEN, MASAYOSHI SON, and SARA MARTINEZ TUCKER,<br><br>Defendants. | Civil Action No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><u>JURY TRIAL DEMANDED</u> |

## PLAINTIFF'S COMPLAINT

Plaintiff, Arthur Gober ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction (the "Proposed Transaction" or "Merger") announced on April 29, 2018, pursuant to which Sprint Corporation ("Sprint" or the "Company") will be acquired by T-Mobile US, Inc. ("T-Mobile").

2.      On April 29, 2018, the Company's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into a Business Combination Agreement (the "Merger Agreement") with T-Mobile, Huron Merger Sub LLC ("T-Mobile Merger Company"); Superior Merger Sub Corporation, a wholly owned subsidiary of T-Mobile Merger

Company ("Merger Sub"); Starburst I, Inc. ("Starburst"), Galaxy Investment Holdings, Inc. ("Galaxy," and together with Starburst, the "SoftBank US HoldCos"), Deutsche Telekom AG ("Deutsche Telekom"), Deutsche Telekom Holding B.V., ("DT Holdings") and SoftBank Group Corp. ("SoftBank").  Under the terms of the Proposed Transaction, T-Mobile will acquire each issued and outstanding share of Sprint common stock in an all-stock transaction at a fixed exchange ratio of 0.10256 T-Mobile shares for each Sprint share or the equivalent of 9.75 Sprint shares for each T-Mobile share (the "Merger Consideration").  The implied offer price per share of the Merger Consideration is $6.62 per Sprint share.  The Proposed Transaction has an implied enterprise value of approximately $59 billion.  Upon completion of the Merger, the combined company will be named T-Mobile.

3.      On April 30, 2018, the Company filed a Form 8-K with the SEC detailing the Proposed Transaction, and included the Merger Agreement dated April 29, 2018.

4.      On July 30, 2018, Defendants (as defined below) caused a preliminary proxy statement on Form S-4 (the "Proxy") to be filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  As described herein, the Proxy omits certain material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

5.      Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' wrongdoing described herein.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

9.     Plaintiff is, and has been at all times relevant hereto, an owner of Sprint common stock.

10.     Defendant Sprint is a Delaware corporation, with its principal executive offices located in Overland Park, Kansas.  Sprint common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "S."

11.     Defendant Raul Marcelo Claure has served as a member of the Company's Board since January 2014, and has served as the Executive Chairman since May 31, 2018.  Previously, Claure served as President from August 2014 until January 2018 and as Chief Executive Officer ("CEO") from August 2014 until May 2018. Claure serves as Chief Operating Officer of SoftBank Group Corp. ("SoftBank") and as CEO of SoftBank Group International.  Claure has served as a

director of SoftBank since June 2017 and currently serves as a director of Arm Holdings plc, a subsidiary of SoftBank.

12.     Defendant Michel Combes has served as a director on the Board and as Sprint's President since January 2018, and as CEO since May 31, 2018.  Combes served as Sprint's Chief Financial Officer from January 2018 through May 2018.

13.     Defendant Gordon M. Bethune has served as a Board member since 2004.

14.     Defendant Patrick T. Doyle has served as a Board member since 2016.

15.     Defendant Ronald D. Fisher has served as the Vice Chairman of the Board and a Board member since 2013.

16.     Defendant Julius Genachowski has served as a Board member since 2015.

17.     Defendant Stephen R. Kappes has served as a Board member since May 2018.

18.     Defendant Admiral Michael G. Mullen has served as a Board member since 2013.

19.     Defendant Masayoshi Son has served as a Board member since 2013.  Son has been the CEO and Chairman of the Board of SoftBank since February 1986.  Son founded SoftBank in September 1981.  Son served as the President of SoftBank from February 1986 through June 2015.

20.     Defendant Sara Martinez Tucker has served as a Board member since 2013.

21.     The defendants listed in ¶¶ 11-20 are collectively referred to herein as the "Individual Defendants."

22.     The Individual Defendants and Sprint are referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

23.     According to the Company's Form 10-K for the year ended December 31, 2017, Sprint is a large wireless communications company in the United States, offering "wireless and wireline services to subscribers in all 50 states, Puerto Rico and the U.S. Virgin Islands under the Sprint corporate brand which includes its retail brands of Sprint, Boost Mobile, Virgin Mobile and

Assurance Wireless on" its "wireless networks utilizing various technologies including third generation (3G) code division multiple access (CDMA), and fourth generation (4G) services utilizing Long Term Evolution (LTE)."

24.     On April 29, 2018, Sprint and T-Mobile issued a press release announcing that they had entered into a definitive agreement where Sprint will be acquired by T-Mobile in an all-stock transaction.  Specifically, Sprint shareholders will receive 0.10256 T-Mobile shares for each Sprint share or the equivalent of 9.75 Sprint shares for each T-Mobile share.  The implied offer price per share of the Merger Consideration is $6.62 per Sprint share.  The press release further stated, in relevant part, the following:

> T-Mobile US (NASDAQ: TMUS) and Sprint Corporation (NYSE: S) today announced they have entered into a definitive agreement to merge in an all-stock transaction at a fixed exchange ratio of 0.10256 T-Mobile shares for each Sprint share or the equivalent of 9.75 Sprint shares for each T-Mobile US share. Based on closing share prices on April 27, this represents a total implied enterprise value of approximately $59 billion for Sprint and approximately $146 billion for the combined company. The new company will have a strong closing balance sheet and a fully funded business plan with a strong foundation of secured investment grade debt at close.
>
> The combined company will be named T-Mobile, and it will be a force for positive change in the U.S. wireless, video, and broadband industries. The combination of spectrum holdings, resulting network scale, and expected run rate cost synergies of $6+ billion, representing a net present value (NPV) of $43+ billion will supercharge T-Mobile's Un-carrier strategy to disrupt the marketplace and lay the foundation for U.S. companies and innovators to lead in the 5G era.
>
> The New T-Mobile will have the network capacity to rapidly create a nationwide 5G network with the breadth and depth needed to enable U.S. firms and entrepreneurs to continue to lead the world in the coming 5G era, as U.S. companies did in 4G. The new company will be able to light up a broad and deep 5G network faster than either company could separately. T-Mobile deployed nationwide LTE twice as fast as Verizon and three times faster than AT&T, and the combined company is positioned to do the same in 5G with deep spectrum assets and network capacity.
> The combined company will have lower costs, greater economies of scale, and the resources to provide U.S. consumers and businesses with lower prices, better quality, unmatched value, and greater competition. The New T-Mobile will employ

more people than both companies separately and create thousands of new American jobs.

Following closing, the new company will be headquartered in Bellevue, Wash., with a second headquarters in Overland Park, Kan. John Legere, current President and Chief Executive Officer of T-Mobile US and the creator of T-Mobile's successful Un-carrier strategy, will serve as Chief Executive Officer, and Mike Sievert, current Chief Operating Officer of T-Mobile, will serve as President and Chief Operating Officer of the combined company. The remaining members of the new management team will be selected from both companies during the closing period. Tim Höttges, current T-Mobile US Chairman of the Board, will serve as Chairman of the Board for the new company. Masayoshi Son, current SoftBank Group Chairman and CEO, and Marcelo Claure, current Chief Executive Officer of Sprint, will serve on the board of the new company.

"This combination will create a fierce competitor with the network scale to deliver more for consumers and businesses in the form of lower prices, more innovation, and a second-to-none network experience – and do it all so much faster than either company could on its own," said John Legere. "As industry lines blur and we enter the 5G era, consumers and businesses need a company with the disruptive culture and capabilities to force positive change on their behalf."

"The combination of these two dynamic companies can only benefit the U.S. consumer. Both Sprint and T-Mobile have similar DNA and have eliminated confusing rate plans, converging into one rate plan: Unlimited," said Marcelo Claure. "We intend to bring this same competitive disruption as we look to build the world's best 5G network that will make the U.S. a hotbed for innovation and will redefine the way consumers live and work across the U.S., including in rural America. As we do this, we will force our competitors to follow suit, as they always do, which will benefit the entire country. I am confident this combination will spur job creation and ensure opportunities for Sprint employees as part of a larger, stronger combined organization, and I am thrilled that Kansas City will be a second headquarters for the merged company."

It is critically important that America and American companies lead in the 5G era. Early U.S. leadership in 4G fueled a wave of American innovation and entrepreneurship that gave rise to today's global mobile Internet leaders, creating billions in economic value and job growth. America's early 4G leadership is credited with creating 1.5 million jobs and adding billions to the U.S. GDP. With 5G, the stakes are even higher – because 5G will be even more transformational. Only the combined company will have the network capacity required to quickly create a broad and deep 5G nationwide network in the critical first years of the 5G innovation cycle – the years that will determine if American firms lead or follow in the 5G digital economy. With Sprint's expansive 2.5 GHz spectrum, T-Mobile's nationwide 600 MHz spectrum, and other combined assets, the New T-Mobile plans to create the highest capacity mobile network in U.S. history. Compared to

T-Mobile's network today, the combined company's network is expected to deliver 15x faster speeds on average nationwide by 2024, with many customers experiencing up to 100x faster speeds than early 4G.

Neither company standing alone can create a nationwide 5G network with the breadth and depth required to fuel the next wave of mobile Internet innovation in the U.S. and answer competitive challenges from abroad.

Neither can AT&T and Verizon in the near term, even though they will still respectively own 34% and 172% more spectrum than the combined company. Even with their vast resources, AT&T and Verizon cannot rapidly build nationwide 5G and their planned 5G networks will only be available sporadically in just a handful of very limited areas. To build nationwide 5G, they either have to kick current customers off LTE, which would take years, or use a type of spectrum (millimeter wave) that can only carry a signal 2,000 feet from a cell site – versus multiple miles for other spectrum – making it nearly impossible for either of them to create a truly nationwide 5G network quickly.

Ubiquitous high-speed 5G service and Internet of Things ("IoT") capabilities will ignite innovation across industries and create the conditions for U.S. firms and innovators to lead the globe in the 5G era.

"Going from 4G to 5G is like going from black and white to color TV," added Claure. "It's a seismic shift – one that only the combined company can unlock nationwide to fuel the next wave of mobile innovation."

5G for All will unleash incredible benefits and capabilities for consumers and businesses. Imagine, for example, augmented reality heads-up displays that see everything you do, and provide real-time cloud-driven information about the people and objects around you. Imagine never losing anything again because low-cost sensors with decade long battery life are embedded in everything you own. Imagine an earpiece providing real-time translation as a friend speaks to you in another language. Imagine environmental sensors in infrastructure and for agriculture having a profound impact on productivity.

**Shifting the Un-carrier Strategy Into Overdrive – Reducing Prices and Driving More Competition**

The new company expects prices to drop as competition heats up. The New T-Mobile will have lower costs, greater economies of scale, and unprecedented network capacity – a winning combination that should make wireless, and adjacent industries like cable and broadband, more affordable for everyone.
The combination will dramatically accelerate T-Mobile's successful Un-carrier strategy, which is built around listening to customers and solving their pain points. It will also leverage Sprint's incredible spectrum assets and strong DNA.

The deal will create more competition and unmatched value for customers across the country. And, existing T-Mobile and Sprint customers will benefit from increased speeds, coverage, and performance as the two companies' networks combine.

Wireless, broadband, and video markets are rapidly converging. AT&T is now the largest TV provider in the country. Comcast added more wireless phone customers last year than AT&T and Verizon combined, and Charter is launching wireless this year. And, more than 1 in 10 Americans (12%) use wireless as their only Internet or broadband connection, freeing themselves from the grip of the traditional, uncompetitive in-home broadband providers.

"This isn't a case of going from 4 to 3 wireless companies – there are now at least 7 or 8 big competitors in this converging market. And in 5G, we'll go from 0 to 1. Only the New T-Mobile will have the capacity to deliver real, nationwide 5G," added Legere. "We're confident that, once regulators see the compelling benefits, they'll agree this is the right move at the right time for consumers and the country." In this rapidly converging marketplace, the new company will bring more choice and competition – for all consumers, including three key underserved areas:

•    Rural communities. Rural Americans seldom have a choice of more than one or two wireless, broadband, or cable providers. The New T-Mobile will end that with increased reach and plans to open hundreds of new stores in rural communities, creating thousands of new jobs. Millions of Americans in rural communities will have more choice and competition, where they may have none today.

•    Broadband. 51% of Americans have only one high-speed broadband option – no choice at all! The combined company will create a viable alternative for millions by enabling mobile connections that rival broadband, driving prices lower and improving service.

•    Business and government wireless services. Today, Verizon and AT&T dominate this category with 4x more customers than Sprint and T-Mobile added together. With its assets and capabilities, the new company will unlock real competition for business and government customers.

**Driving Significant U.S. Job Growth**

From the first day Sprint and T-Mobile combine and every year thereafter, the new company will employ more people in the U.S. than both companies would separately. More than 200,000 people will work on behalf of the combined company in the U.S. at the start. And, the New T-Mobile plans to invest up to $40 billion in its new network and business in the first three years alone, a massive capital outlay that will fuel job growth at the new company and across related

sectors. This is 46% more than T-Mobile and Sprint spent combined in the past three years.

This combination will also force AT&T, Charter, Comcast, Verizon, and others to make investments of their own to compete, driving billions more in accelerated investment.

Five years ago, T-Mobile merged with MetroPCS to compete in the 4G era – a transaction that has resulted in substantial job growth. Three times the number of people work on MetroPCS today compared to the time of the acquisition in 2013. With that track record, the New T-Mobile will accelerate long-term economic stimulus for the U.S. in the 5G era -- ultimately leading to the creation of thousands of American jobs and supporting business opportunities for the U.S. economy.
5G is expected to create 3 million new U.S. jobs and $500 billion in economic growth by 2024, according to a report from CTIA, and the combined company will be a catalyst in driving that massive economic stimulus.

**Transaction Details and Financial Profile**

The new company expects to create substantial value for T-Mobile and Sprint shareholders through an expected $6+ billion in run rate cost synergies, representing a net present value (NPV) of $43+ billion, net of expected costs to achieve such cost synergies. This transaction will also enhance the financial position of the combined company. Highlights include:

- Pro Forma 2018E Service Revenue [1] of $53-57 billion
- Pro Forma 2018E Adjusted EBITDA [1,2] of $22-23 billion
- Pro Forma 2018E Adjusted EBITDA [1,2] Margin of 40-42% with a longer-term target of 54-57%
- Pro Forma 2018E Net Debt [3] of $63-65 billion with a streamlined single-silo corporate debt structure
- Fully funded business plan with significant liquidity at close

The Boards of Directors of T-Mobile and Sprint have approved the transaction. Deutsche Telekom and SoftBank Group are expected to hold approximately 42% and 27% of diluted economic ownership of the combined company, respectively, with the remaining approximately 31% held by the public. The Board will consist of 14 directors, 9 nominated by Deutsche Telekom and 4 nominated by SoftBank Group, including Masayoshi Son, Chairman and CEO of SoftBank Group, and Marcelo Claure, CEO of Sprint. John Legere, CEO of the New T-Mobile, will also serve as a director. Upon consummation of the transaction, the combined company is expected to trade under the (TMUS) symbol on the NASDAQ.
The new company will have some of the most iconic brands in wireless – T-Mobile, Sprint, MetroPCS, Boost Mobile, Virgin Mobile – and will determine brand strategy after the transaction closes.

The transaction is subject to customary closing conditions, including regulatory approvals. The transaction is expected to close no later than the first half of 2019.

**Advisors**

PJT Partners is acting as financial advisor to T-Mobile and rendered a fairness opinion to its Board of Directors. Goldman Sachs is acting as financial advisor to Deutsche Telekom and T-Mobile and rendered a fairness opinion to the T-Mobile Board of Directors. Deutsche Bank also acted as financial advisor to T-Mobile. Wachtell, Lipton, Rosen & Katz is providing legal counsel to T-Mobile and Deutsche Telekom, with Cleary Gottlieb and DLA Piper serving as regulatory counsel. Raine is acting as financial advisor to a committee of independent directors of T-Mobile and rendered a fairness opinion, and Latham & Watkins is providing legal counsel to the committee of independent directors. Richards, Layton and Finger is serving as Delaware Counsel. Morgan Stanley served as financial advisor to Deutsche Telekom. Barclays, J.P. Morgan, Deutsche Bank, Goldman Sachs, Morgan Stanley, and RBC are providing T-Mobile with committed debt financing to support the transaction, and PJT Partners is advising T-Mobile on the debt financing associated with the transaction.

The Raine Group LLC is acting as lead financial advisor to Sprint. J.P. Morgan is also acting as a financial advisor to Sprint. Centerview Partners LLC is acting as financial advisor to the Independent Transaction Committee of the Board of Directors of Sprint. The Raine Group LLC, J.P. Morgan and Centerview Partners LLC each rendered fairness opinions to the Board of Directors of Sprint. Morrison & Foerster LLP is lead legal counsel to Sprint and for SoftBank Group. Goodwin Procter LLP is legal counsel to the Independent Transaction Committee of the Board of Directors of Sprint. Skadden, Arps, Slate, Meagher & Flom LLP is regulatory co-counsel and Potter Anderson Corroon LLP is Delaware Counsel. Mizuho Securities Co., Ltd. and SMBC Nikko Securities Inc. are acting as financial advisors to SoftBank Group.

25.     The $6.62 per share all stock offer price has only a 1.8% premium to Sprint's closing price of $6.50 per share on April 27, 2018.  The $6.62 per share all stock offer price is significantly below Sprint's 52-week high stock price of $9.11 per share on May 11, 2017; below Sprint's 52-week average stock price of $6.84 per share; and below the price target of $7.00 per share for Sprint in April 2018 by at least three analysts, New Street Research; Evercore ISI; and Wells Fargo Securities.

26.     In soliciting shareholder approval for the Proposed Transaction, the Proxy purports to contain a summary and overview of the Proposed Transaction, but omits certain critical information, rendering portions of the Proxy materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein.  As a result, Sprint shareholders lack material information necessary to allow them to make an informed decision concerning whether to vote in favor of the Merger.

27.     Although T-Mobile's forecasts cover the quarter ended March 31, 2018 through 2026E, and are purportedly summarized on pages 153-157 of the Proxy, those forecasts are materially incomplete in that they fail to disclose line items used to calculate: (i) earnings before interest, taxes, depreciation and amortization ("EBITDA"); (ii) adjusted EBITDA; and (iii) unlevered free cash flow and fail to reconcile non-GAAP to GAAP metrics.

28.     Although Sprint's forecasts cover 2018E through 2022E and are purportedly summarized on pages 158-162 of the Proxy, those forecasts are materially incomplete in that they fail to disclose line items used to calculate: (i) EBITDA; (ii) adjusted EBITDA; and (iii) levered free cash flow and fail to reconcile non-GAAP to GAAP metrics.  Additionally, the T-Mobile management Sprint forecasts that cover the quarter ended March 31, 2018, through 2026E are also materially incomplete in that they fail to disclose a reconciliation of non-GAAP to GAAP figures.

**Sprint's Financial Advisors**

29.     In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by the Company's financial advisors, Raine Securities LLC ("Raine"); and J.P. Morgan Securities LLC ("J.P. Morgan"), in support of their fairness opinions.  As part of Raine's fairness opinion, Raine reviewed, among other things, "certain additional financial other information regarding the business, operations and

future prospects of Sprint, which was furnished to us by Sprint, including certain financial projections (the 'Sprint Projections') prepared by the management of Sprint;" "certain additional financial and other information regarding the business, operations, and future prospects of T-Mobile, which was furnished to us by T-Mobile, including certain financial projections (the 'T-Mobile Projections') prepared by the management of T-Mobile;" and "certain financial information of a proforma combined entity, including associated synergies that may result from the Merger, pursuant to projections jointly prepared by the managements of T-Mobile and Sprint." Proxy at K-1; 2. As part of J.P. Morgan's fairness opinion, J.P. Morgan reviewed, among other things, "certain internal financial analyses and forecasts prepared by or at the direction of the managements of the Company and [T-Mobile] relating to their respective businesses" Proxy at L-1.

    <u>Raine Securities LLC</u>

    30.    The Proxy states that in rendering its fairness opinion, Raine "performed a discounted cash flow analysis of Sprint's projected unlevered free cash flows based on the Sprint management Sprint forecasts and the adjusted Sprint management Sprint forecasts for the calendar years 2018 and 2022." Proxy at 125. However, the two Sprint forecasts only disclosed levered free cash flow and there was no line item detail for levered free cash flow. The Proxy should have disclosed the unlevered free cash flows that formed the basis for this analysis, including line item details, and the line item detail for the levered free cash flow, including, for both, projected EBIT, cash taxes, depreciation and amortization, capital expenditures, and changes in working capital, so that shareholders can make their own determination as to the reliability of this valuation. Also, while the Proxy discloses that Raine utilized an "assumed perpetuity growth rates ranging from 0.0% to 1.00%," the Proxy fails to disclose the basis for perpetuity growth rates. Proxy at 125. In

addition, the Proxy fails to disclose the inputs used to calculate the weighted average cost of capital ("WACC") ranging from 7.00% to 8.00%. Proxy at 125. While Sprint's net operating losses ("NOLs") were incorporated into the analysis, the Proxy also fails to disclose Sprint's annual NOL figures used in the analysis.

31.     With respect to Raine's Precedent Transactions Analysis, "Raine reviewed and compared certain financial information relating to the merger with corresponding financial information of seven selected other transactions announced between June 2008 and September 2013." Proxy at 126. However, the Proxy fails to disclose the multiples of each of the seven selected precedent transactions.

32.     Raine's DCF analysis of T-Mobile's projected unlevered free cash flow was based on T-Mobile's forecasts for the calendar years 2018 through 2022. Specifically, "Raine calculated the discounted cash flow value per share of T-Mobile common stock using discount rates ranging from 6.50% to 7.50%." Proxy at 128. While the DCF analysis was based on unlevered free cash flow, the Proxy fails to disclose any line item detail for this unlevered free cash flow. The Proxy should have disclosed these line items, including projected EBIT, cash taxes, depreciation and amortization, capital expenditures, and changes in working capital, so that shareholders can make their own determination as to the reliability of this valuation. Also, while the Proxy does disclose that Raine utilized an "assumed perpetuity growth rates ranging from 0.0% to 1.00%," the Proxy fails to disclose the basis for perpetuity growth rates. *Id*. In addition, the Proxy fails to disclose the inputs used to calculate the WACC ranging from 6.50% to 7.50%. While T-Mobile's NOLs were incorporated into the analysis, the Proxy also fails to disclose T-Mobile's annual NOL figures used in the analysis.

33.     Raine also "performed a discounted cash flow analysis of the combined company based on the Sprint management Sprint forecasts, the adjusted Sprint management Sprint forecasts, the T-Mobile management T-Mobile forecasts and the estimated synergies."  Proxy at 129. However, the Proxy fails to disclose the same items as discussed above.  *See* ¶¶ 30; 32.  In addition, while synergies were incorporated into the Illustrative DCF Analysis, but the Proxy fails to disclose the annual synergy figures.  As part of the Illustrative DCF Analysis, Raine also conducted a Pro Forma Comparison by performing "a discounted cash flow analysis of the combined company's projected unlevered free cash flows based on the combined company forecasts."  Proxy at 130.  However, the Proxy fails to disclose Sprint's unlevered free cash flows and any line item detail for T-Mobile's unlevered free cash flow.  *See* ¶¶ 30; 32.

34.     With respect to Raine's Analysts' Price Targets, which was done for informational purposes, Raine reviewed "equity research analysts' 12-month share price targets for Sprint common stock and T-Mobile common stock."  Proxy at 130.  However, the Proxy fails to disclose the names of the research firms and their respective price targets.  While the Company's shareholders could, potentially, do research on their own to determine this information, the shareholders should not have to undertake this significant project merely to obtain this material information, which the Company already has readily available.  Further, the Proxy fails to disclose the mean and median price targets for T-Mobile and Sprint, separately.

35.     With respect to Raine's Premiums Paid Analysis which was done for informational purposes, Raine "applied a range of illustrative acquisition premium of 15% to 30% to the unaffected per share price of Sprint common stock as of April 9, 2018, which resulted in prices that ranged from $5.91 to $6.68."  Proxy at 131.  However, the Proxy fails to disclose how that range was derived.

J.P. Morgan Securities LLC

36.     With respect to the Selected Public Trading Multiples Analysis performed by J.P. Morgan on Sprint and T-Mobile, one metric was based on 2018E adjusted cash EBITDA, but that figure was not disclosed for Sprint or T-Mobile.

37.     J.P. Morgan's DCF Analysis of Sprint was based on Sprint's unlevered free cash flows for the calendar years 2018 through 2022, but only levered free cash flow was disclosed, and the Proxy fails to disclose any line item detail for unlevered free cash flow.  Also, the Proxy fails to disclose any information about the inputs that were used to calculate the WACC from 6.50% to 7.50%.  While Sprint's NOLs were incorporated into the analysis, the Proxy fails to disclose Sprint's annual NOL figures used in the analysis.  Proxy at 136.

38.     J.P. Morgan's DCF Analysis of T-Mobile was based on T-Mobile's unlevered free cash flows for the calendar years 2018 through 2022.  Again, the Proxy fails to disclose any line item detail for unlevered free cash flow.  Also, the Proxy fails to disclose any information about the inputs that were used to calculate the WACC from 6.50% to 7.50%. While T-Mobile's NOLs were incorporated into the analysis, the Proxy fails to disclose T-Mobile's annual NOL figures used in the analysis.  Proxy at 140.

39.     With respect to J.P. Morgan's Selected Transaction Analysis, J.P. Morgan examined selected transactions with respect to seven selected companies engaged in businesses analogous to Sprint.  However, the Proxy fails to disclose the multiples of each of the selected transactions.

40.     For reference purposes, J.P. Morgan also performed analyses of Analyst Price Targets for Sprint and T-Mobile.  However, the Proxy fails to disclose the analysts' price targets for either company.

41.     J.P. Morgan also "conducted an implied intrinsic value creation analysis, based on the Sprint management Sprint forecasts and the T-Mobile management T-Mobile forecasts, that compared the implied equity value of Sprint common stock and T-Mobile common stock derived from a discounted cash flow valuation on a standalone basis to the pro forma combined company implied equity value, taking into account the estimated synergies."  Proxy at 141.  However, the Proxy fails to disclose the same items as discussed above.  *See* ¶¶ 37; 38.  In addition, while synergies were incorporated into the Intrinsic Value Creation Analysis, the Proxy fails to disclose the annual synergy figures.  As part of the Intrinsic Value Creation Analysis, J.P. Morgan also "conducted an implied value creation analysis based on the adjusted Sprint management Sprint forecasts and the T-Mobile management T-Mobile forecasts."  However, the Proxy fails to disclose the same items as discussed above.  *See* ¶¶ 37; 38.  Next, J.P. Morgan "created hypothetical incremental implied value to the holders of Sprint common stock."  Proxy at 141.  Proxy at However, the Proxy fails to disclose the range of the implied values.

Centerview Partners LLC

42.     The Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by Centerview Partners LLC ("Centerview"), acting as the financial advisor to Sprint's independent committee.  As part of Centerview's fairness opinion, Centerview reviewed, among other things, "certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of Sprint, including certain financial forecasts, analyses and projections relating to Sprint prepared by management of Sprint and furnished to us by Sprint for purposes of our analysis (the 'Sprint Forecasts');" "certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of T-Mobile, including certain financial forecasts,

analyses and projections relating to T-Mobile prepared by management of T-Mobile and furnished to us by Sprint for purposes of our analysis (the 'T-Mobile Forecasts');" and "certain pro forma forecasts, including tax and other cost savings and operating synergies projected by the management of T-Mobile and Sprint to result from the Transaction furnished to us by Sprint for purposes of our analysis (the 'Synergies')." Proxy at M-2.

43.     With respect to Centerview's DCF Analysis for Sprint, the analysis was based on Sprint's unlevered free cash flows for the calendar years 2018 through 2022.  Again, the Proxy fails to disclose any line item detail.  Also, the Proxy fails to disclose the basis for the perpetuity growth rates ranging from "(1) 1.0% to 2.0% based on the Sprint management Sprint forecasts and (2) 0.75% to 1.75% based on the adjusted Sprint management Sprint forecasts."  Proxy at 150.  In addition, the Proxy fails to disclose the basis for the inputs that were used to calculate the WACC ranging from 7.25% to 8.25%.  While Sprint's NOLs were incorporated into the analysis, the Proxy fails to disclose Sprint's annual figures used in the analysis.  Proxy at 150.

44.     With respect to Centerview's DCF Analysis for T-Mobile, the analysis was based on T-Mobile's unlevered free cash flows for the calendar years 2018 through 2022.  Again, the Proxy fails to disclose any line item detail for unlevered free cash flow.  Also, the Proxy fails to disclose the basis for the perpetuity growth rates ranging from 1.0% to 2.0%.  In addition, the Proxy fails to disclose the basis for the inputs that were used to calculate the WACC ranging from 6.50 to 7.50%.  While T-Mobile's NOLs were incorporated into the analysis, the Proxy fails to disclose T-Mobile's annual NOL figures used in the analysis.  Proxy at 150.

**T-Mobile**

45.     The Proxy also contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by T-Mobile's financial advisors, PJT

Partners LP ("PJT"); and Goldman Sachs & Co. LLC ("Goldman"), in support of their fairness opinions.  As part of PJT's fairness opinion, PJT reviewed, among other things, "certain internal financial analyses, estimates and forecasts relating to [T-Mobile], including projections for the [T-Mobile's] fiscal years 2018 through 2026, that were prepared by or at the direction of and approved and furnished to us by the management of" T-Mobile (the "T-Mobile Projections"); "certain financial analyses, estimates and forecasts relating to Sprint, including (a) projections for calendar years 2018 through 2022 that were prepared by the management of Sprint and approved for our use and furnished to us by the management of [T-Mobile] (the 'Sprint Projections') and (b) projections for calendar years 2018 through 2026 that were prepared by or at the direction of and approved and furnished to us by the management of" T-Mobile (the "T-Mobile Management Sprint Projections").  Proxy at H-1; 2.  As part of Goldman's fairness opinion, Goldman reviewed, among other things, "certain internal financial analyses and forecasts for Sprint prepared by its management; and certain internal financial analyses and forecasts for [T-Mobile] on a stand-alone basis and on a pro-forma basis giving effect to the Transaction and certain financial analyses and forecasts for Sprint, in each case, as prepared by the management of [T-Mobile]" (the "Forecasts").  Proxy at I-2.

    PJT Partners LP

    46.    With respect to PJT's Precedent Transactions Analysis, PJT analyzed the valuation and financial metrics relating to fourteen selected transactions since 2004 involving companies in the US wireless industry, and derived an implied valuation of $ 6.52 to $8.27 per share for Sprint common stock based on T-Mobile management forecasts, which is above the value of the offer price of $6.13 per share as of the date of the Proxy.

47.     PJT also performed DCF "analyses of Sprint using both the T-Mobile management Sprint forecasts and the Sprint management Sprint forecasts."  Proxy at 89.  While both DCF analyses were based on unlevered free cash flow, the Proxy only disclosed levered free cash flow in the Sprint management Sprint forecasts.  In addition, the Proxy fails to disclose any line item details for unlevered free cash flow in both of the analyses.  Also, the Proxy fails to disclose the inputs used to calculate the WACC or the annual NOL figures that were incorporated into the analyses.  PJT also performed a 4.75 year DCF Analysis based on the Sprint Management Sprint Forecasts, the implied valuation for Sprint common stock is $7.52 to $10.07 per share which is above the value of the offer price of $6.13 per share as of the date of the Proxy.

48.     PJT's DCF Analysis of T-Mobile was based on unlevered free cash flow, but the Proxy fails to disclose any line item detail.  Also, the Proxy fails to disclose the inputs used to calculate the WACC or the annual NOL figures that were incorporated into the analysis.

49.     With respect to PJT's Contribution Analysis, PJT "reviewed and compared Sprint's and T-Mobile's respective cumulative levered free cash flows."  Proxy at 91.  However, the Proxy fails to disclose T-Mobile's levered free cash flows.

50.     Next, PJT performed a "'Has/Gets' analysis in order to compare (1) the standalone DCF-based per share value of T-Mobile to (2) the DCF-based per share value of the combined company, giving effect to the completion of the merger transactions, in each case from the perspective of the holders of T-Mobile common stock."  Proxy at 91.  However, the Proxy fails to disclose any line item detail of the unlevered free cash flow either as a standalone T-Mobile company or a pro forma combined company.   Also, the Proxy fails to disclose the inputs used to calculate the WACC or the annual NOL figures that were incorporated into the analysis.

51.    For informational purposes, PJT also performed a discounted analyst price target analysis based on "publicly available Wall Street research analysts' standalone share price targets in the next 12 months for each of Sprint common stock and T-Mobile common stock."  Proxy at 92.  However, the Proxy fails to disclose the price targets or the group's mean or median price targets for either company.  While PJT excluded "each of the highest and lowest standalone share price targets for each of Sprint common stock and T-Mobile common stock," the Proxy fails to disclose any explanation for the exclusions.  *Id.*  Again, while PJT discounted the target price, the Proxy fails to disclose the inputs used to calculate the cost of equity.

Goldman Sachs & Co. LLC

52.    Goldman performed an illustrative DCF analysis on Sprint on a "standalone basis to derive a range of illustrative present values per share of Sprint common stock on a standalone basis, excluding estimated synergies."  Proxy at 99.  The DCF analysis was based on unlevered free cash flow, but the Proxy fails to disclose any line item details for the unlevered free cash flow in the analysis.  Also, the Proxy fails to disclose the inputs used to calculate the discount rates ranging from 8.5% to 9.5%.  Also, the Proxy fails to disclose the annual NOL figures that were incorporated into the analysis.

53.    Next, Goldman performed a Selected Publicly Traded Companies Analysis with two publicly traded companies in the U.S wireless communications industry by incorporating Sprint's NOLs, but the Proxy fails to disclose the annual NOL figures or the inputs used to calculate the discount rate.  While the analysis derived "a range of implied values per share of Sprint common stock of $5.92 to $7.10 per share" which was based on core EBITDA, the Proxy fails to disclose such figures with respect to Sprint's core EBITDA.  Proxy at 100.

54.     With respect to Goldman's Selected Precedent Transactions Analysis, the analysis incorporated Sprint's NOLs, but the Proxy fails to disclose the annual NOL figures that were incorporated into the analysis or the inputs used to calculate the discount rate.  Similar to the deficiency of Goldman's Selected Publicly Traded Companies Analysis, the Proxy fails to disclose Sprint's core EBITDA even though the range of implied values per share of Sprint common stock of $4.17 to 8.26 per share was based on Sprint's core EBITDA.

55.     With respect to Goldman's Premia Paid Analysis, Goldman "analyzed the premia paid in pending or completed U.S. transactions since 2000 in which the target company had an equity value based on the transaction consideration that was greater than $10 billion."  Proxy at 102.  However, the Proxy fails to disclose the premiums for each of the transactions.

56.     Next, Goldman performed an Illustrative DCF Analysis "on T-Mobile on a standalone basis and on the combined company to derive a range of illustrative present values per share of T-Mobile common stock on a standalone basis and per share of T-Mobile common stock giving effect to the completion of the merger transactions."  Proxy at 103.  Regardless of whether the analysis is to analyze T-Mobile as a standalone company or as a pro forma company, the analysis was based on unlevered free cash flow, but the Proxy fails to disclose any line item detail about the unlevered free cash flow.  Also, the Proxy fails to disclose the inputs used to calculate the discount rates ranging from 7.5% to 8.5%.  Also, the Proxy fails to disclose the annual NOL figures that were incorporated into the analysis.

Evercore Group L.L.C.

57.     The Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by Evercore Group L.L.C. ("Evercore"), acting as the financial advisor to T-Mobile's independent committee.  As part of Evercore's

fairness opinion to T-Mobile's independent committee, Evercore reviewed, among other things, "certain non-public projected financial and operating data relating to the Company prepared and furnished to us by the management of the Company;" "certain non-public projected financial and operating data relating to the Company prepared and furnished to us by the management of [T-Mobile]"; and "certain non-public projected financial and operating data relating to [T-Mobile] prepared and furnished to us by the management of [T-Mobile]." Proxy at J-2.

58.     Evercore's Selected Peer Trading Analysis utilized the estimated core EBITDA of Sprint and T-Mobile in calculating the companies' implied values. However, the Proxy fails to disclose Sprint and T-Mobile's core EBITDA.

59.     Next, Evercore performed a DCF analysis of "Sprint to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that Sprint was projected to generate from March 31, 2018 through calendar year 2026, based on the T-Mobile management Sprint forecasts." Proxy at 112. The Proxy fails to disclose any line item detail of Sprint's unlevered free cash flow. The Proxy fails to disclose the basis for the range of perpetuity growth rates. Also, the Proxy fails to disclose the inputs used to calculate the range of WACC of 6.25% to 7.25%. Also, the Proxy fails to disclose the annual NOL figures that were incorporated into the analysis. While Evercore "indicated an implied per share equity value reference range for Sprint on a standalone basis of approximately $6.71 to $11.49," per share which is above the value of the offer price of $6.13 per share as of the date of the Proxy. *Id.*

60.     Next, Evercore performed a DCF analysis of "T-Mobile to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that T-Mobile was projected to generate from March 31, 2018 through calendar year 2026, based on the T-Mobile management T-Mobile forecasts." *Id.* Although the analysis was based T-Mobile's unlevered free cash flow,

the Proxy fails to disclose any line item detail of the unlevered free cash flow.  The Proxy fails to disclose the basis for the range of perpetuity growth rates.  Also, the Proxy fails to disclose the inputs used to calculate the range of discount rates of 6.0% to 7.0%.  Also, the Proxy fails to disclose the annual NOL figures that were incorporated into the analysis.

61.     With regard to Evercore's Net Present Value of Future Stock Price Analyses of Sprint and T-Mobile, the Proxy fails to disclose the inputs used to calculate the WACC of 9.0% and 8.5% for Sprint and T-Mobile, respectively.

62.     Evercore performed an Illustrative DCF "Has-Gets" Analysis based on T-Mobile's standalone discounted cash flow implied equity value using the T-Mobile management T-Mobile forecasts and Sprint's standalone discounted cash flow implied equity value using the T-Mobile management Sprint forecasts.  However, the Proxy fails to disclose the same items as discussed above concerning T-Mobile and Sprint's DCF analyses.  *See* ¶¶ 59; 60.  The Proxy also fails to disclose the inputs used to calculate T-Mobile and Sprint's WACC or the basis for the perpetuity growth rates.  The Proxy fails to disclose the annual synergy figures or the annual NOL figures regarding the Sprint restructuring charges.

63.     For informational purposes, Evercore "reviewed public available share price targets of research analysts' estimates known to Evercore as of April 26, 2018" for T-Mobile and Sprint.  Proxy at 114.  However, the Proxy fails to disclose the price targets of the research analysts, and the mean or median price targets of the group of research analysts.  The Proxy fails to disclose the names of the research analysts and their respective research firms.

64.     For informational purposes, Evercore performed a precedent premia analysis by analyzing the "premia paid in all-stock transactions above $5 billion over the past ten years."  *Id*.  However, the Proxy fails to disclose each of the transactions' premium or their low, mean, median

or high premiums.  While the analysis "indicated a per share equity value reference range of approximately $6.90 to $7.20 for Sprint" the Proxy fails to disclose why the equity value reference range is above the Merger Consideration of $6.62 per share in the Proposed Transaction. *Id.*

65.     The non-disclosed information discussed above, would be material to Sprint shareholders in deciding how to vote their shares, as the real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttress that result.  When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion, as well as the key multiples and range of multiples used in those analyses, must also be fairly disclosed.

66.     Further, the non-disclosed information discussed above prevents shareholders from understanding the context of the figures or consider whether any of the inputs thereto or ranges derived therefrom are anomalous.  Absent this information, Sprint shareholders are unable to determine whether the Proposed Transaction is indeed fair and in their best interest.

67.     Without the foregoing material disclosures, Sprint shareholders are unable to fully understand and interpret financial analyses by Raine; J.P. Morgan; and/or Centerview or the fairness of the Merger Consideration when determining whether to vote in favor of the Proposed Transaction.

68.     There are also material omissions in the Proxy concerning the process leading up to the Merger, in respect to the various nondisclosure agreements ("NDAs") entered into by Sprint and various parties.

69.     For example, at the beginning of the background and chronology of events that led to the Proposed Transaction, the Proxy states that "T-Mobile, Deutsche Telekom, Sprint and Softbank entered into a nondisclosure agreement in connection with" "discussions from time to

time regarding a possible business combination between T-Mobile and Sprint." Proxy at 62. As part of the process, the Proxy also states that in late June 2017, SoftBank, Sprint, Company A and Company B "entered into a nondisclosure agreement in connection with discussions of a potential strategic transaction." Proxy at 64. Subsequently, in July 2017, SoftBank and one of Company A's largest shareholders, Shareholder X "entered into a nondisclosure agreement in connection with discussions of a possible business combination between Sprint and Company A, and Sprint subsequently became a party to such nondisclosure agreement." *Id*. In December 2017, as part of "a possible business combination between Sprint and Company C," "Sprint and Company C entered into a nondisclosure agreement." Proxy at 67.

70.     However, the Proxy fails to disclose the material terms of the NDAs as it is relevant to shareholders to know whether certain potential acquirers received different terms in their respective NDAs. Significantly, the Proxy fails to disclose whether the NDA entered into by T-Mobile is the same NDAs entered into by other potential acquirers including Company A; Shareholder X; Company B; and Company C. Thus, it is unclear whether T-Mobile received certain and/or additional rights in its NDA, not given to other potential acquirers that signed their respective NDAs.

71.     Without the terms of the NDAs disclosed, it is difficult for shareholders to determine whether parties such as Company A; Shareholder X; Company B and Company C to these agreements were provided with the same right to submit confidential proposals following news of a definitive merger agreement, or whether these NDAs contained standstill provisions, and if so, whether the standstill provisions had don't-ask-don't-waive ("DADW") provisions[1]

---

[1] A DADW provision prohibits potential acquirors from even *asking* the target to waive the standstill prohibitions to allow them to submit topping bids. Several courts have noted that DADW provisions violate a target board's duty to act reasonably, in an informed matter, and in furtherance of the goal of seeking the highest possible sales price, and therefore have ordered injunctive relief when a danger existed that such

and/or sunset provisions, or whether the counterparties could seek a waiver of such standstills to make an unsolicited offer to acquire the Company.

72.     If these NDAs entered into by certain potential acquirers contained standstill provisions, these parties are likely prohibited from coming forward with a topping bid if waivers do not exist in the NDAs.

73.     The omission of the details regarding these NDAs in the Proxy renders it materially misleading because it gives the false impression that the counterparties who had entered into negotiations with the Company prior to its signing of the Merger Agreement have the ability to come forward with a topping bid, when they may, in fact, be contractually prohibited from doing so.   Thus, the omission of this information renders all references to the NDAs in the Proxy materially false and misleading.

74.     Without the foregoing material information, the Company's shareholders will not be able to fully understand and interpret the financial analyses, including their impact on the fairness of the Merger Consideration, when determining whether to vote in favor of the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Sprint (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

76.     This action is properly maintainable as a class action for the following reasons:

---

clauses prevented superior bids from arising.

a.     The Class is so numerous that joinder of all members is impracticable.  As of August 6, 2018, there were 4 billion shares of Sprint common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

g.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

## COUNT I

### Claim for Violation of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against All Defendants)

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

79.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

80.     Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders.  No representation contrary to the foregoing shall be made."  17 C.F.R. § 240.14a-9(b).

81.     As discussed herein, the Proxy misrepresents and/or omits material facts concerning the Merger.

82.     Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to Sprint shareholders.  In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83.     The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

84.     By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing the complete financial analyses by Raine; J.P. Morgan; and Centerview purportedly summarized in the Proxy.

85.     The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

86.     Sprint is deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

87.     Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

88.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14a-9, absent injunctive relief from the

Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

89.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**Claim for Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     The Individual Defendants acted as controlling persons of Sprint within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Sprint, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

92.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of

30

each of the Individual Defendants to approve the Merger.  They were thus directly connected with and involved in the making of the Proxy.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

95.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

96.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     Directing the Individual Defendants to disseminate an Amendment to the Company's Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


DATED:  September 28, 2018                Respectfully submitted,

                                          EDGAR LAW FIRM LLC

                                           _/s/ John F. Edgar_____

                                          John F. Edgar        KS Bar No. 18080
                                          Brendan M. McNeal   KS Bar No. 27520
                                          EDGAR LAW FIRM LLC
                                          1032 Pennsylvania Ave.
                                          Kansas City, MO  64105
                                          Telephone: (816) 531-0033
                                          Facsimile: (816) 531-3322
                                          jfe@edgarlawfirm.com
                                          bmm@edgarlawfirm.com

                                          WOLF POPPER LLP
                                          Carl L. Stine    (to appear *pro hac vice*)
                                          Fei-Lu Qian    (to appear *pro hac vice*)
                                          845 Third Avenue
                                          New York, New York 10022
                                          Telephone:  212-759-4600
                                          Facsimile:  212-486-2093
                                          cstine@wolfpopper.com
                                          fqian@wolfpopper.com

                                          *Attorneys for Plaintiff*